IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

BRADLEY BEUTLER

Defendant.

**REPORT AND RECOMMENDATION**

09-CR-00096-WMS-JJM-7

Defendant Bradley Beutler has moved to suppress evidence seized from his apartment on May 7, 2009 [389].[1] That motion, being dispositive, has been referred to me by Hon. William M. Skretny for a Report and Recommendation [108]. An evidentiary hearing was held before me on December 22, 2010 [447], and the parties thereafter submitted post-hearing briefs [457, 459]. For the following reasons, I recommend that the motion be granted.

## BACKGROUND

Defendant is charged with numerous crimes, including being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2). Third Superseding Indictment [143], Count Twenty-Five. He seeks suppression of a shotgun and ammunition seized from his apartment at 630 Lancaster Court in Depew, New York on May 7, 2009.

[1] Bracketed references are to CM-ECF docket entries.

Armed with a warrant for defendant's arrest, three teams of law enforcement personnel arrived at defendant's apartment at approximately 6:00 a.m. on that morning: a SWAT team, an arrest team, and a search team [447/6].[2] At the time of their arrival, the SWAT team identified defendant in his car leaving the parking lot, on his way to work. He was pulled from the car and placed in handcuffs ([447/6]), surrounded by several armed agents [447/17]. He was placed under arrest by officer Howarth Colon of the FBI Safe Streets Task Force, who had previously been defendant's probation officer.

Officer Colon advised defendant of his rights, and defendant executed a form ([430-1]) acknowledging that he had been advised of his right to remain silent and to counsel [447/7]. That form was not a consent to search the apartment [447/15]. Officer Colon then asked defendant if he had any weapons in the apartment, and defendant replied that he had a shotgun in the bedroom closet [447/8]. Officer Colon admitted that although they did not have a search warrant, they hoped to search the apartment [447/10]. He testified that defendant granted him oral permission to secure the weapon [447/8].

Officer Colon then entered the living room of defendant's apartment and spoke with the "search team" leader, FBI special agent ("SA") Dianne Shaffer. SA Shaffer and the search team had arrived at the apartment shortly after the arrest. By the time they arrived, the SWAT team was already in the apartment [447/24-25]. There were nine members of the search team, and all were armed [447/34]. He told her that defendant had given verbal consent to secure the shotgun, which would be found in the bedroom closet [447/9]. She introduced herself to Lynn Surdej, who was with her daughter in the living room. She told her that although defendant had

---

[2] The second numeral refers to the page number of the hearing transcript [447].

already consented to the search, they would like her consent as well [447/27]. During that conversation members of the SWAT team were already walking through the apartment [447/38]. Ms. Surdej signed a consent form [430-6] authorizing the search of the apartment. Thereafter, agents located and seized a shotgun and ammunition [447/31].

Ms. Surdej testified that shortly after defendant left for work, she heard people in the apartment shouting "police" [447/41]. She saw her front door being slammed in and an officer running up the stairs and screaming at her to get down [447/41]. She saw approximately ten agents running through the house with guns, and one of them said "I'm going to shoot your f*cking dog" [447/42]. They looked in the bedroom and bathroom, and she then heard someone say "the house is clear" [447/43-44].

They told her to get up, and took her and her daughter Madison into the living room [447/44-45]. She heard someone lift up the back of the toilet and asked SA Shaffer "what is he doing?" Shaffer responded "you need to sign this. We're going to search your apartment" [447/47]. She signed the document ([430-6]) without reading it, assuming that once they opened the door, they had permission [447/48]. She stated that the search was already taking place when she was asked for her consent [447/63].

She stated that the front door had a huge dent [447/49]. A contractor, John Neureuther, testified that the door was battered in the vicinity of the doorknob, and that the interior frame was "pretty shot" [447/68].

Defendant stated that he was arrested in the middle of the parking shortly after 6 a.m. while on his way to work [447/72]. He was surrounded by ten armed officers [447/73]. As he was speaking to Officer Colon, he saw other agents bashing in the door and entering his

apartment [447/74-75]. He did not mention the gun until after he had seen the SWAT team breach the apartment door [447/78]. Officer Colon then told him that he was going in to retrieve the gun, and did not request his permission to do so [447/77].

## ANALYSIS

### A. Validity of Consents

"One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). However, "consent to search is not to be lightly inferred", United States v. Chisholm, 2009 WL 29313, *4 (E.D.N.Y. 2009), and its existence "should be scrutinized with care" where, as here, the defendant is in custody. United States v. Vasquez-Santiago, 602 F.2d 1069, 1073 (2d Cir.1979), cert. denied, 447 U.S. 911 (1979).

"To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Garcia, 56 F.3d 418, 422 (2d Cir.1995). "The government has the burden of proving, by a preponderance of the evidence, that [the] consent to search was voluntary." United States v. Gandia, 424 F.3d 255, 265 (2d Cir. 2005).

I credit defendant's testimony that he was not asked for, and did not give, consent to search the apartment. Moreover, during his conversation with Officer Colon, defendant was handcuffed and surrounded by armed officers, and had already seen the SWAT teams entering his apartment after bashing the door in. Therefore, even if he did consent to a search of the

apartment, the government has failed to prove that his consent was voluntary rather than merely an "acquiescence in a show of authority". *See* Garcia.

Similarly, Lynn Surdej signed the consent form while several armed officers were already searching her apartment, and in response to SA Shaffer's statement that "you have to sign this. We're going to search your apartment." While SA Shaffer testified that she asked Ms. Surdej to consent, the number of agents accompanying her on the search team clearly indicates that she did not expect consent to be refused. Therefore, I conclude that the government has likewise failed to prove that her consent to search was voluntarily given.

**B. Validity of the Search Absent Consent**

SA Shaffer testified that as she arrived at the apartment, four or five SWAT team members were already walking through the premises to do "a protective clear" [447/37]. However, since the SWAT team had already identified defendant in the parking lot ([447/6]), they knew he was not in the apartment. "For law enforcement officers to conduct a warrantless protective sweep of a premises after an arrest outside thereof they must have (1) a reasonable belief that other persons are inside, and (2) a reasonable belief that the other persons are aware of the arrest outside the premises and might destroy evidence, escape or jeopardize the safety of the officers or the public." United States v. Baker, 2010 WL 2465533, *2 (W.D.N.Y. 2010) (Arcara, J.) (*quoting* United States v. Oguns, 921 F.2d 442, 446 (2d Cir.1990)).

The government offered no evidence to satisfy the second prong of the Baker/Oguns test - in fact, it acknowledged that "this case is not that" situation. Government's

memorandum [457], p.10, n.5. In any event, the firearm and ammunition were not found during this "protective sweep", but only later, after the apartment had been declared secure.

**C. Inevitable Discovery**

In its pre-hearing submission [413], the government made no mention of its intention to invoke the "inevitable discovery" doctrine. However, in its post-hearing memorandum, the government argues that "[a]s soon as Colon obtained the admission that the shotgun was in the defendant's apartment, the agents at the scene had probable cause . . . which implicates the doctrine of inevitable discovery . . . . *Anything* that followed the defendant's admission about the shotgun is immaterial because, in the end, a warrant would have issued authorizing agents to search the apartment for the shotgun". [457], p.11 (emphasis in original).

The inevitable discovery doctrine assumes "that the challenged evidence is in some sense the product of illegal government activity". Nix v. Williams, 467 U.S. 431, 444 (1984). In that case, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Id. The doctrine can apply even "when the police acted in bad faith in illegally detecting the challenged evidence. So long as it is clear that such evidence would inevitably have been discovered by lawful means, suppression is inappropriate." United States v. Whitehorn, 829 F.2d 1225, 1231 (2d Cir. 1987), cert. denied, 487 U.S.1237 (1988).

However, "the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have

been obtained without the constitutional violation". United States v. Heath, 455 F.3d 52, 58 (2d Cir. 2006). Instead, "illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, *with a high level of confidence*, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." Id. at 60 (emphasis added). "Inevitable discovery analysis therefore requires a court to examine *each of the contingencies* that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred." Id. (emphasis in original). Application of the doctrine "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification". Nix, 467 U.S. at 444, n.5.

Therefore, in order to prevail under the doctrine, the government must prove that defendant would have admitted possessing firearms even if he had not witnessed the SWAT team illegally breaking into his apartment. While that might be possible, I do not think it is likely - and I certainly do not have a "high level of confidence" (Heath, supra) that he would have done so. Defendant was no stranger to the criminal justice system, and he had to have known that the admission was highly incriminating. Therefore, it appears highly unlikely that he would have admitted possessing a firearm unless, realizing that agents were already in his apartment, he concluded that they would have discovered it in any event.

Since the government has failed to prove a necessary contingency - namely, that had it not first illegally entered his apartment, defendant would have made the admission which gave it probable cause - I conclude that the inevitable discovery doctrine is inapplicable in this case.

**D. Do the Benefits of Deterrence Outweigh the Costs of Excluding the Evidence?**

Although neither party has addressed the cost/benefit analysis required by United States v. Julius, 610 F.3d 60 (2d Cir. 2010), I am obligated to do so, since "a court should order exclusion only after it has satisfied itself that the benefits of deterrence . . . outweigh the costs." Id. at 66 (*citing* Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 700 (2009)).

In Herring, the Court acknowledged that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct", and stated that the rule should continue to apply where the conduct at issue is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system". 129 S.Ct. at 702. *See also* Julius, 610 F.3d at 68 ("We emphasize that *Herring* should not serve as an enticement for law enforcement personnel to depart from search procedures which comply with the Fourth Amendment. Rather, *Herring* requires careful consideration by district courts of whether the goal of deterring violations of the Fourth Amendment outweighs the costs to truth-seeking and law enforcement objectives in each case").

The fact that the May 7, 2009 search was "warrantless . . . entails different concerns about deterrence of police misconduct" than were present in Herring. Julius, 610 F.3d at 67. Therefore, I must "consider whether the other circumstances of the search support a finding that the law enforcement officers had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, requiring suppression." Id.

In this case, having already identified defendant in the parking lot, the SWAT team knew that he was not in the apartment. Since "[p]olice officers are presumed to know the law governing their conduct", Pritzker v. City of Hudson 26 F. Supp.2d 433, 443 (N.D.N.Y. 1998),

they knew, or should have known, that they could enter the apartment to conduct a "protective sweep" only if they held "a reasonable belief that the other persons *are aware of the arrest outside the premises* and might destroy evidence, escape or jeopardize the safety of the officers or the public." Baker, 2010 WL 2465533, *2 (emphasis added); Oguns, 921 F.2d at 446. The government made no attempt to show that they held such a belief, arguing instead that "this case is not that because here the officers had probable cause to believe the firearm . . . was in the apartment". Government's memorandum [457], p.10, n.5.

The flaw in that argument is that the entry by the SWAT team occurred *before* defendant told Officer Colon that the firearm was in the apartment - indeed, it was likely a motivating factor in that admission, as well as in the "consents" given by defendant and Ms. Surdej. Under these circumstances, I conclude that the illegal entry into defendant's apartment was sufficiently deliberate that the benefits of deterring future similar misconduct outweigh the costs of excluding the evidence. Therefore, I recommend that the evidence seized from defendant's apartment be suppressed.[3]

## CONCLUSION

For these reasons, I recommend that defendant's motion to suppress evidence [389] be granted. Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by April 15, 2011 (applying the time

[3] While defendant moved to suppress the firearm and the ammunition, he did *not* move to suppress his admission to Officer Colon that he had a firearm in the apartment. Therefore, that admission should not be suppressed. However, the issue for purposes of the inevitable discovery doctrine is not whether or not his admission was voluntary, but whether he would have made the admission *at all* had he not seen the SWAT team already entering his apartment. The government bears the burden of proving that he would have, and has not met that burden.

frames set forth in Fed. R. Crim. P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of this court's Local Rules of Criminal Procedure, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority", and pursuant to Local Rule 58.2(a)(4), the objections must include "a written statement either (1) certifying that the objections do not raise new legal/factual arguments, or (2) identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: March 29, 2011

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge